# EXHIBIT A





(1) COLT Telecom A/S

and

(2) Frontline Communications International, Inc.

---

**COLT*Interconnect* AGREEMENT**

---

# CONTENTS

1. Definitions ... 3
2. Duration ... 6
3. Connection of Systems ... 6
4. Provision of Call Conveyance Services ... 7
5. System Changes ... 7
6. Regulation ... 7
7. Operations and Equipment ... 7
8. Calling Line Identity ... 7
9. Confidentiality ... 8
10. Rates and Charges ... 8
11. Terms of Payment ... 9
12. Liability ... 9
* 13. Termination and Suspension ... 10
14 Credit Limit ... 10
* 15. Consequences of Termination ... 11
16 Assignment ... 11
17 Force Majeure ... 11
18 Notices ... 11
20. Entire Agreement ... 12
21. Variation ... 12
22. Waiver ... 12
23. No Third Party Rights ... 12
24. Choice of Law and Arbitration ... 12

**THIS COLT *Interconnect* AGREEMENT ("Agreement") is made this 1st day of September, 2004.**

**BETWEEN:**

**(1) COLT Telecom A/S whose registered office is at Borgmester Christiansensgade 55, DK-2450 Copenhagen SV, Denmark, CVR No. 25 76 03 52 ("COLT"), and**

**(2) Frontline Communications International, Inc. whose registered office is at 150 East 58th Street, 28th Floor, New York, New York 10155 ("Operator").**

**RECITALS:**

A. COLT runs telecommunications systems and provides telecommunications services in Denmark.

B. Operator is entitled to run telecommunications systems and to provide telecommunications services globally..

C. COLT and Operator wish to connect their Systems and to provide Services to each other on the following terms and conditions:

**TERMS AGREED:**

**1. Definitions**

1.1. In this Agreement the following words shall have the following meanings:

| | |
|---|---|
| "Agreement" | This Agreement, its Schedules and Rates notified by one party to the other from time to time. |
| "Aggregate Payment Liability" | Charges already invoiced under this Agreement and payments which will be due for Services already provided but yet to be invoiced (in both cases including any disputed amounts). |
| "Associated Company" | In relation to either party, those persons Controlled by, Controlling, or under common Control with such party. |
| "Call" | A transmission path between two NTPs passing through the POC and the parties' Systems over which two-way simultaneous communication may occur by means of the sending of Messages. |
| "Call Conveyance" | The establishment of a transmission path through a party's System to either an NTP or to a point of interconnection with another Carrier. |

COLT *Interconnect*

and the conveyance of Messages over such transmission path between such NTP or point of interconnection and the POC. For the avoidance of doubt, either party may use other Carriers in providing Call Conveyance to the other party.

"Call Duration" The time in minutes (but expressed as, and rounded up to, the nearest tenth of a second) that elapses between the moment when:

- an answer signal in the backward direction generated by a person is detected by the party initiating the Call; and
- a clear forward signal is detected by the party initiating the Call or
- maximum 90 seconds after the party receiving the Call cuts off

"Carrier" A telecommunications operator falling within Annex II to the Interconnection Directive (97/33/EC).

"Charges" The charges for the provision of the Services duly invoiced pursuant to Clause 13 of this Agreement.

"CLI" Signalling information passed through the POC to the other party's System which unambiguously either:

- identifies the NTP from which a Call is originated; or
- identifies an NTP to which a return or subsequent Call may be made.

"Control" The possession by any person(s) or nominee(s) directly or indirectly of the power to direct or cause the direction of the management of another person.

"Credit Limit" The maximum Aggregate Payment Liability Operator is allowed to incur within a billing period, such Credit Limit being subject to change on a regular basis.

"Force Majeure" Any event beyond a party's reasonable control. Such events include but are not limited to any act of God or Government, flood, fire, explosion, lightning, terrorism or industrial action outside the direct control of the affected party.

| | |
|---|---|
| "NTP" | Network termination point. |
| "NTS" | Number Translation Services – Freephone, Local Rate, National Rate, Premium Rate and International Freephone Services. These are offered with a wide range of call routing options, comprehensive management information options and Non-Geographic Number Portability (NGNP) capability. |
| "Messages" | (a) Speech, music and other sounds; (b) visual images; (c) signals serving for the impartation (whether as between persons and persons, things and things or persons and things) of any matter otherwise than in the form of sounds or visual images; or (d) signals serving for the actuation or control of machinery or apparatus. |
| "Partial CLI" | Signalling information passed to the other party over the POC which unambiguously identifies the first switch from which a Call is originated. |
| "POC" | A physical point of connection at which COLT's System and the Operator's System are connected as further specified in Schedule 2. |
| "Rates" | EURO per minute rates for Call Conveyance purchased by the Operator and USD per minute rates for Call Conveyance purchased by COLT, notified to each party by the other from time to time in accordance with Clause 11 of this Agreement. Unless expressly stated otherwise, international termination rates shall include Call Conveyance to fixed geographic numbers as well as Call Conveyance to mobile, number translation and any other specially tariffed numbers. |
| "Ready for Service Date" | The date when the Services are tested and operational in both parties' reasonable opinion. |
| "Services" | The Call Conveyance services and NTS services provided by each party to the other party under this Agreement. |
| "SLA" | The mutual service level agreement between the parties governing the quality of the Services set out in Schedule 1. |
| "System" | Transmission systems and, where applicable, switching equipment and other resources which permit the conveyance of signals between [illegible] |

[illegible]

| | |
|---|---|
| | defined termination points by wire, by radio, by optical or by other electromagnetic means. |
| "System Change" | Changes to a party's System that will have, or are likely to have, a materially detrimental effect on the provision of the Services to the other. |
| "Term" | In relation to each notification of Rates, the period for which such Rates are valid. |

1.2 References in this Agreement to any party include references to its successors in title and assigns.

1.3 References to legislation shall be deemed to refer to such legislation as amended or replaced from time to time.

## 2. Duration

2.1. This Agreement shall commence on the date set out above.

2.2. This Agreement shall remain in effect until terminated either pursuant to Clause 15 or pursuant to Clause 2.3.

2.3. Either party may terminate this Agreement on ninety (90) days written notice to the other.

## 3. Connection of Systems

3.1. The parties shall connect and keep connected their Systems as specified in Schedule 2. Each party shall, at its own cost, be responsible for providing, installing, testing, making operational and maintaining all equipment in its System (i.e. on its side of a POC).

3.2. Either party may notify the other party if it considers that it requires:

3.2.1. extra private wire interconnect capacity between the parties' Systems; or

3.2.2. additional switch ports.

3.3. The requested party shall be under no obligation to procure or to provide additional interconnect capacity or additional switch ports but may, in its sole discretion choose to do so.

3.4. If any private wire interconnect capacity connecting the parties' Systems is not used for two (2) consecutive calendar months then either party may, on thirty (30) days notice, disconnect its System from such unused private wire connection and reallocate its switch ports.

3.5. Each party shall give the other not less than seven (7) days notice of any planned outage and as much notice as is reasonably possible in respect of any unplanned outage. In the event of any outage the party responsible shall use reasonable endeavours to minimise any disruption to the Services, to correct any faults and to resume normal service as soon as reasonably possible.

## 4. Provision of Call Conveyance Services

4.1. Each party shall use reasonable endeavours to provide the Services to each other:

4.1.1. exercising the skill and care of a competent Carrier; and

4.1.2. in accordance with the SLA.

## 5. System Changes

5.1. Each party shall give the other party at least three (3) months notice if it wishes to make any System Change.

5.2. Neither party shall have any liability to the other party in respect of any System Change which is not within the control of the party making the change.

## 6. Regulation

6.1. The parties will use and provide the Services in accordance with any applicable statutory provisions and any order or determination of any competent authority.

6.2. The parties will ensure that they do not use the Services for any improper or unlawful purposes, nor knowingly allow others to do so, after making due and proper enquiry, and shall hold at all relevant times all appropriate licences or consents to run their respective Systems.

## 7. Operations and Equipment

7.1 All equipment provided by one party in connection with this Agreement shall remain the property of that party and form part of that party's System. Each party will comply with any reasonable instruction of the other regarding such equipment. Equipment on the other party's premises will be kept secure and not interfered with by any person. Upon any termination or expiry of this Agreement the parties will ensure prompt access to any relevant site to remove equipment and that all necessary consents to do so are obtained.

7.2. At no time shall maintenance or provisioning activity be carried out by one party on equipment provided, owned or operated by the other party without the first party's prior written consent.

7.3. The parties shall endeavour to comply with all reasonable requests for access when one party requires access to the other party's site in order to maintain equipment or to ensure the continued provision of the Services.

## 8. Calling Line Identity

8.1. Each party shall use reasonable endeavours to provide CLI to the other party [illegible] of Calls passed over a POI for the purpose of [illegible] and agreed administrative use [illegible]

8.2. Each party [illegible]

shall be obliged to pass CLI received from the System of the other party to such organisation.

8.3. If a party is unable to pass full CLI then Partial CLI shall be passed. However, if a Call has not originated on that party's System and that party has not been provided with CLI from the originating System, that party shall not be obliged to provide the CLI.

## 9. Confidentiality

9.1. A ny prior Confidentiality Agreement signed between the parties shall be incorporated into this Agreement and shall survive termination or expiry of this Agreement.

9.2. Without prejudice to Clause 10.1, the existence, terms, SLA and Rates contained in this Agreement and all Rates or Charges notified by either party to the other party pursuant to this Agreement shall be regarded as confidential.

## 10. Rates and Charges

10.1. Each party shall notify the other in writing from time to time of:

10.1.1. its Rates for the provision of the Services; and

10.1.2. the Term of validity of such Rates.

10.2. Subject to Clause 11.3, Rates shall be effective for all Calls conveyed from the date of notification.

10.3. Each party shall notify the other of Rate increases in writing with a minimum of 7 (seven) days prior to the execution of any Rate increase.

10.4. Each party may decrease its Rates at any time by written notice to the other party.

10.5. COLT agrees to submit all notices for new rates, modifications of existing rates, or code changes, to Operator only by e-mail to *rates@frontlineusa.com*. Any such notices submitted by COLT by any other method will be deemed ineffective, and Operator will not be held responsible or be bound by such notices. The Operator is obliged to confirm the receipt of such rates changes.

10.6. All calls shall be billed with a second/second increments (1/1). Any exceptions to this shall be specifically agreed between the Parties and included as an Appendix or another written agreement.

10.7. Charges shall be calculated by multiplying Call Duration by the applicable Rate.

10.8. No Charges shall be payable for the conveyance of any Call which is not answered.

10.9. Any Calls sent to either party for which no Rates have been agreed shall be charged at the last notified Rate or if no Rate has previously been notified the then prevailing wholesale list rate of the party conveying such Call. If no such rate exists the parties shall use reasonable endeavours to agree a reasonable rate.

10.10. If a third party provides a private wire service to connect the parties Systems or if COLT provides a private wire service to connect the parties Systems the parties shall bear the cost equally.

Each party shall add any such applicable tax to its invoices which shall be paid by the other party. Unless otherwise stated, all Rates and Charges shall be exclusive of value added tax or any other domestically applicable tax.

## 11. Terms of Payment

11.1. Each party shall be entitled to invoice the other party for the Services on a monthly basis or, on 30 (thirty) days' written notice, at such other frequency as the invoicing party wishes. Subject to Clause 11.3, each party shall pay all Charges due (whether disputed or not) under this Agreement within current month + thirty (30) days of the date of the invoice.

11.2. Each party expressly reserves the right to set off any sums owing under this Agreement against any sums due and owing by the other party.

11.3. If payment of undisputed amounts is not made when due then the invoicing party may, without prejudice to its other rights, charge simple daily interest equivalent to an annual rate of 1.5% per month or the maximum permitted by law.

11.4. If either party shall dispute the Charges, it shall notify the other party in writing as soon as is reasonably practicable, identifying clearly the disputed part of an invoice and the reasons why it is challenged.

11.5. The parties shall promptly investigate any disputed Charges and any other amount payable under this Agreement in the event of a dispute. Any dispute will be escalated to the level of Managing Director, or equivalent, for consideration.

## 12. Liability

12.1. Nothing in this Agreement shall restrict or exclude either party's liability for fraud or for death or personal injury caused by it's, or its employees', negligence.

12.2. Subject to Clause 12.1, neither party shall be liable to the other party or to any third party for any Indirect or Consequential Loss or Damages whether in contract, tort or otherwise (including negligence). For the purposes of this Clause 12.2 "Indirect or Consequential Loss or Damages" shall mean any economic loss including, without limitation, any direct or indirect loss of profits, anticipated savings, business, contracts, revenue, time or goodwill or loss or harm of data always provided that this shall not include:

12.2.1. [illegible] Charges payable under this Agreement;

12.2.2. the incremental cost to a party of procuring replacement Services in the event of default by the other party under this Agreement; or

12.2.3. the repair (or if repair is not practicable, replacement) of any tangible physical property of a party intentionally or negligently damaged by the other party or its employees whilst on the first party's premises.

12.3. Subject to Clauses 12.1, 12.2 and the obligation to pay Charges due under this Agreement, each party's total aggregate liability to the other party in respect of all causes of action arising in each Calendar Year in contract, tort or otherwise (including liability for negligence or breach of statutory duty) under, in connection with or arising out of the supply or non-supply of Services or this Agreement shall be limited to damages equal to 125% of the Charges payable in such Calendar Year (which shall be calculated by reference to Charges actually paid and the outstanding invoices for such Calendar Year). In the event that it is not possible to ascertain the level of the Charges payable in any Calendar Year then each party's liability to the other party in respect of all causes of action arising in each Calendar Year in contract, tort or otherwise (including liability for [illegible]