# EXHIBIT C



**International Chamber of Commerce**

*The world business organization*

**International Court of Arbitration** ● **Cour internationale d'arbitrage**

# AWARD

**ICC International Court of Arbitration** ● **Cour internationale d'arbitrage de la CCI**
38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28   Fax +33 1 49 53 29 33
Web site www.iccarbitration.org   E-mail arb@iccwbo.org

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 14109/AVH

### COLT TELECOM A/S

(Denmark)

**vs/**

### FRONTLINE COMMUNICATIONS INTERNATIONAL INC.

(U.S.A.)

This document is an original of the Final Award rendered in conformity with the Rules of the ICC International Court of Arbitration.

INTERNATIONAL CHAMBER OF COMMERCE

INTERNATIONAL COURT OF ARBITRATION

CASE No. 14109/AVH

COLT TELECOM A/S (Denmark)

Claimant

-v-

FRONTLINE COMMUNICATIONS INTERNATIONAL INC. (USA)

Respondent

---

# FINAL AWARD

---

# FINAL AWARD

1.    This is the final and only award of the Tribunal in this arbitration.

2.    This award is set out as follows:

| Chapter | | Page |
|---|---|---|
| I. | Introduction and procedural history | 1 |
| II. | Background and history of dispute | 8 |
| III. | Claimant's case | 9 |
| IV. | Respondent's case | 10 |
| V. | Issues to be determined | 11 |
| VI. | Tribunal's findings | 12 |
| VII. | Interest | 19 |
| VIII. | Costs | 20 |
| IX. | Decision | 21 |

## I.    INTRODUCTION AND PROCEDURAL HISTORY

### A.    The Parties

3.    The Claimant is **COLT Telecom A/S**, of Borgmeister Christiansengade 55, DK 2450 Copenhagen SV, Denmark. The Claimant is a Danish corporation, in the business of supplying voice and data telecommunications services to and from Denmark. The Claimant shall be referred to as "COLT" in this award.

4.    COLT was represented throughout this arbitration by DLA Piper UK LLP, of 1 St Paul's Place, Sheffield, United Kingdom.

5.    The Respondent is **Frontline Communications International Inc.**, of 150 East 58th Street, 28th Floor, New York, New York 10155, U.S.A., as at the Terms of Reference (however, that address may no longer be correct, see paragraph 6 below). The

Respondent is a corporation established under the laws of the State of New York, U.S.A. and is a seller of telecommunications services. The Respondent shall be referred to as "Frontline" in this award.

6. Frontline was initially represented by Hodgson Russ LLP, of 230 Park Avenue, 17th floor, New York, New York 10169, U.S.A. On 7 September 2006, Hodgson Russ LLP informed the Tribunal that it had ceased to act for Frontline and requested that all further correspondence be addressed to c/o Mel Cooper, 721 Fifth Avenue, Apt. 45K, New York, New York 10022, U.S.A. Mel Cooper wrote on 4 October 2006 (however, the letter was not received) and on 26 October 2006 indicating that Frontline was in the process of retaining new counsel. Since that date, despite repeated requests for Frontline to communicate its position to the Tribunal, no further correspondence has been received from Frontline or its representatives.

**B.    Agreement to Arbitrate and Governing Law**

7. The disputes referred to arbitration arise out of an Interconnect Agreement entered into between the parties, dated 1 September 2004 (the "Interconnect Agreement").

8. Clause 24.4 of the Interconnect Agreement provided:

    "If the parties are unable to resolve a dispute in accordance with clause 24.2 [amicable resolution] the dispute will be resolved or settled at the written request of either party by arbitration. Such arbitration is to be concluded in accordance with the Rules of Procedure (the "Rules") established by the ICC's International Court of Arbitration (ICA)."

9. Clause 24.1 of the Interconnect Agreement provided:

    "This Agreement shall be construed and interpreted in accordance with and governed by the laws of England to the exclusion of any choice [of] law."

**C.    Procedural History**

*Commencement of arbitration, pleadings and appointment of arbitrators*

10. COLT filed a Request for Arbitration and Points of Claim, under cover of letter dated 21 November 2005, with the International Court of Arbitration of the ICC (the "ICC Court"). It filed an Amended Request for Arbitration, under cover of letter dated 29 November 2005.

3

11. Frontline filed an Answer to the Amended Request for Arbitration, dated 3 February 2006.

12. COLT served a Request for Further Information from Frontline, under cover of letter dated 27 February 2006. Frontline objected.

13. COLT filed a Reply, under cover of letter dated 6 March 2006.

14. On 17 February 2006, the ICC Court confirmed Mr William Wood QC as co-arbitrator, following nomination by COLT.

15. On 17 February 2006, the ICC Court confirmed Mr Gary B. Born as co-arbitrator, following nomination by Frontline.

16. On 10 March 2006, the ICC Court appointed Mr Audley William Sheppard as Chairman of the Arbitral Tribunal, having sought a proposal from the New Zealand ICC National Committee.

*Terms of Reference, Orders, evidence and correspondence*

17. Draft **Terms of Reference** were sent to the parties for comment on 4 April 2006, and following comment and amendment, they were signed by the Tribunal and on behalf of both parties by their counsel, with the last signature dated 12 June 2006, and they were transmitted to the ICC Court at its session on 23 June 2006.

18. The Tribunal issued **Procedural Order No. 1,** dated 11 May 2006. That order included a timetable for service of additional submissions, witness statements, expert reports and document production.

19. On 22 May 2006, Frontline provided a document in response to a request for disclosure relating to its financial condition.

20. On 24 May 2006, COLT served a Request for the Production of Documents by Frontline. Frontline served its Objections to that request on 8 June 2006.

21. On 12 June 2006, COLT served its Additional Submissions together with witness statements of Mr Michael Krogh, Mr Per Soerensen and Mr John Clarke Jr.

22. On 7 July 2006, Frontline requested an extension of time for the making of its submissions, the making of final requests for documents and the submission of disputes over documents. COLT objected to that request on 7 July 2006.

4

23.    The Tribunal issued **Procedural Order No. 2** dated 10 July 2006, by which it extended some of the time limits set out in Procedural Order No. 1.

24.    On 25 July 2006, Frontline served an Interim Submission of Evidence, Points and Authorities, together with a witness statement of Mr Jerome Goldman.

25.    On 2 August 2006, COLT served an Application for Further Directions. The Tribunal responded to that request on 3 August 2006, rejecting the four directions requested.

26.    On 11 August 2006, COLT served its Reply Submissions.

27.    On 25 August 2006, COLT served a Request for the Production of Documents by Frontline.

28.    On 5 September 2006, COLT wrote to the Tribunal and Frontline in relation to the appointment of experts. It indicated that it would likely appoint an expert, should Frontline do so, but that it otherwise would not rely on expert evidence. It submitted that it was not in a position to appoint an expert at that time, citing the lack of a sufficiently particularised defence and counterclaim from Frontline. It requested that the Tribunal direct that it could appoint an expert and serve an expert report after such time as an expert report was served by Frontline. In response to COLT's request, the Tribunal wrote to the parties on 5 September 2006, inviting them to discuss the matter between themselves and report back to the Tribunal.

29.    On 7 September 2006, Hodgson Russ LLP wrote to COLT and the Tribunal to advise that it had ceased acting for Frontline in relation to the arbitration, and requested that future correspondence should be addressed to c/o Mel Cooper, 721 Fifth Avenue, Apt. 45K, New York, New York 10022, U.S.A. On 8 September, COLT wrote to Frontline's new address for service, requesting both confirmation that Frontline intended to continue to contest the arbitration and an indication as to whether it intended to instruct new attorneys. By fax dated 15 September 2006, the Tribunal invited Frontline to address the same two issues and requested that Frontline respond by 22 September 2006. A copy of the Tribunal's fax was also sent to the Fifth Avenue address by courier.

30.    Frontline did not respond. COLT wrote to the Tribunal on 25 September 2006 requesting that it make a peremptory order, prescribing a further period for compliance by Frontline with the requests, failing which the Tribunal should make an award on the basis of the materials provided to it as of that date. COLT attached an interest

schedule to its letter, outlining the interest it claimed was owing to it by Frontline up to 25 September 2006 pursuant to the Interconnect Agreement.

31.    COLT wrote again to the Tribunal on 26 September 2005 clarifying that it wished the Tribunal to make an award in its favour should Frontline fail to comply with any peremptory order and requesting that Frontline's counterclaim be dismissed in any such award.

32.    On the same day, the Tribunal wrote to Frontline ordering it to confirm, by 5 October 2006, whether it intended to continue to participate in the arbitration and if so, give both the name of its appointed counsel, if any, and notify COLT of the discipline(s) and name(s) of the experts it intended to rely upon. A copy was also sent by courier. Frontline failed to respond to that order.

33.    On 9 October 2006, COLT requested the Tribunal to make a peremptory order giving Frontline a limited further period to respond to the order, failing which the Tribunal should make an award or awards on the basis of materials already in its possession.

34.    On 12 October 2006, the Tribunal issued a peremptory order, pursuant to section 41(5) Arbitration Act 1996 ordering Frontline to respond by 19 October 2006 to its orders of 26 September 2006. The Tribunal also invited COLT to comment by 20 October 2006 on the future steps in the arbitration, noting that the Tribunal was presently minded to have a short hearing. A copy was sent by courier to Frontline. Frontline failed to comply. COLT responded to the Tribunal's invitation on 19 October 2006, setting out its proposals for a hearing.

35.    The Tribunal wrote to both parties on 25 October 2006, noting that as no correspondence had been received from Frontline, the arbitration would continue without Frontline's participation and a short hearing would be convened.

36.    On 26 October 2006, Frontline wrote to the Tribunal (although the fax was only received by Mr Born and Mr Wood) requesting time to retain new counsel and attaching a copy of a letter that had been addressed to Mr Sheppard at DLA Piper UK LLP, dated 4 October 2006. The earlier letter (of 4 October), had not been received by the Tribunal or COLT (as confirmed by their counsel). It requested an extension of 45 days to retain new counsel and "prepare a response".

37.    The Tribunal wrote to the parties on 14 November 2006, *inter alia*, proposing 18 or 19 December 2006 for the date of the hearing and asking the parties to indicate which date

would be convenient for them. The Tribunal advised that unless Frontline participated in the hearing and requested otherwise, the Tribunal only required Mr Krogh of COLT's witnesses to be present at the hearing. The Tribunal also referred to Frontline's fax of 26 October and stated that Frontline had had more than sufficient time to instruct new counsel and that any new counsel instructed by Frontline should be prepared to attend the hearing in December. A copy was also sent to Frontline by courier. Frontline did not respond.

38.    COLT wrote twice to the Tribunal on 15 November 2006 expressing concern that Frontline might seek to adduce additional evidence either at or shortly before the hearing. Colt requested the Tribunal to order Frontline to submit any further evidence within 14 days of the order and that, in default, Frontline would not be permitted to adduce any further evidence. COLT further requested that such an order be without prejudice to its rights to object to the late service of evidence. It asked the Tribunal to seek confirmation from Frontline as to whether it intended to attend the hearing and if so, who its representative (if any) would be.

39.    The Tribunal wrote to the parties on 17 November 2006 requesting Frontline to indicate by 24 November 2006 whether it intended to participate at the hearing and, if so, whether it would have external counsel. It also requested Frontline to indicate, by 24 November 2006, whether it would seek to submit further evidence, so that any such request could be considered and appropriate orders made. A copy was also sent to Frontline by courier. Frontline did not respond to those requests.

40.    The Tribunal wrote to the parties on 21 November 2006 fixing 18 December 2006 as the date for the hearing. A copy was also sent to Frontline by courier.

41.    COLT served Skeleton Submissions on the Tribunal and Frontline on 12 December 2006 and served an amended version of the Skeleton Submissions on 13 December 2006.

*The hearing*

42.    A hearing was held on 18 December 2006 at the offices of Clifford Chance LLP, 10 Upper Bank Street, London E14 5JJ.

43.    DLA Piper UK prepared a hearing bundle. The hearing bundle will be referred to in the following style: "B2/10" refers to page 10 of volume 2 of the bundle.

44.    A transcript of the hearing was taken by Merrill Legal Solutions. The transcript will be referred to in the following style: "T/35/16" refers to page 35 and line 16 of the transcript.

45.    At the hearing, Mr Michael Lazarus of 3 Verulam Buildings, Gray's Inn, London (instructed by DLA Piper UK) appeared on behalf of COLT. Despite having received notice (on multiple occasions detailed above), Frontline did not attend the hearing nor indicate any reason for its absence.

46.    Also present were: Mr Richard Norman (DLA Piper UK); Mr Paul Smith (DLA Piper UK); Mr Philip Osman (COLT); Mr Michael Krogh (COLT); Mr Clive Jarus (COLT); and Ms Louise Byrne (trainee solicitor, Clifford Chance LLP).

47.    At the start of the hearing, Mr Lazarus gave a short opening presentation. Mr Michael Krogh was then called to give evidence and was questioned by the Tribunal. Mr Krogh affirmed that his evidence was truthful. Both before and after the witness evidence, Mr Lazarus was asked a number of questions by the Tribunal concerning COLT's case.

48.    At the hearing, COLT submitted its Schedule of Costs. On 21 December 2006, at the request of the Tribunal, COLT submitted its further submissions on costs and supporting evidence.

49.    The Tribunal wrote to the parties on 22 December 2006 and confirmed, for Frontline's information, that the hearing had taken place and that a transcript would be available.

50.    A corrected transcript was sent to the Tribunal by DLA Piper UK on 1 February 2007.

51.    The proceedings were closed pursuant to Article 22 of the ICC Rules on 1 May 2007. The current time limit for the rendering of the Tribunal's Final Award is 30 June 2007.


## II.    BACKGROUND AND HISTORY OF DISPUTE

52.    The background and history of the dispute was set out in the parties' submissions and evidence. The Background as summarised in the Terms of Reference was as follows:

53.    COLT and Frontline entered into an Interconnect Agreement, dated 1 September 2004.

8

54.   Under that agreement, COLT and Frontline agreed to provide call conveyance services to each other, with COLT providing its services in Europe and Frontline providing its services in North America.

55.   Under that agreement, each party charged the other a certain fee for its services. Set off was permitted.

56.   Telecommunications traffic began between the two parties in early 2005.

57.   In mid-2005, in connection with disputes between the parties, COLT reduced its capacity to accept Frontline telecommunications traffic from 20 circuits (or lines) to 2 circuits.

58.   Frontline applied to and obtained a Temporary Restraining Order (the "TRO") from the Supreme Court of the State of New York, enjoining COLT from reducing its telecommunications services to Frontline pursuant to the Interconnect Agreement and requiring COLT to restore the reduced services.

59.   The Parties entered into a TRO Settlement Agreement, dated 17 June 2005, under which, *inter alia*, COLT's services would be ramped down in accordance with an agreed schedule and certain payments would be made between the parties.

60.   Further disputes have since arisen between the parties.


## III.   CLAIMANT'S CASE

61.   COLT's case as summarised in the Terms of Reference, and confirmed in its pre-hearing Skeleton Argument was as follows.

62.   COLT claimed that monies were owed to it by Frontline under the Interconnect Agreement, for services provided by it at Frontline's request.

63.   COLT claimed €2,227,093.57 as follows (applying a conversion rate of USD $1 = €0.849032:

| | |
|---|---|
| Amount due pursuant to invoices dated 6 June, 8 June and 6 July 2005 | €2,593,014.10 |
| Less amount paid by Frontline | €327,038.28 |

| Less sums due to Frontline | €38,882.25 |
|---|---|
| **Sums due to COLT** | **€2,227,093.57** |

64.    Alternatively, COLT claimed USD 100,000 due and unpaid by Frontline under the TRO Settlement Agreement.

65.    Further, COLT claimed interest in the sum of €520,589.46 (to 18 December 2006 and continuing at a daily rate of €1,098.29 until payment) pursuant to clause 11.3 of the Interconnect Agreement on sums due to it, at a rate of 1.5% per month.

66.    COLT also sought to recover its costs in this arbitration.

67.    COLT rejected Frontline's claims (see below) and had reserved the right to rely on clause 12.2 of the Interconnect Agreement (concerning exclusion of liability for indirect or consequential loss or damage) and/or clause 12.6 (concerning a duty to mitigate).

## IV.    RESPONDENT'S CASE

68.    Frontline's case as summarised in the Terms of Reference was as follows. (Frontline did not submit a pre-hearing Skeleton Argument.)

69.    Frontline alleged that during 2005, COLT did not abide by the invoicing terms of the Interconnect Agreement and made unreasonable demands for payment, it failed to pay certain monies owed to Frontline, it overcharged for services and it provided substandard service.

70.    Frontline further alleged that it suffered damages as a result of COLT's reduction in the number of circuits in June 2005, in breach of the Interconnect Agreement.

71.    Frontline alleged that COLT breached and repudiated the Interconnect Agreement.

72.    Frontline also alleged that in direct contravention of the TRO Settlement Agreement, COLT curtailed and degraded the quality of the service to Frontline during the ramp-down period.

73.    Frontline denied that it owed any monies to COLT as claimed or at all.

74.    Frontline sought the following relief:

(a)    COLT's claims to be denied with prejudice;

(b)    A declaration that COLT breached the Interconnect Agreement and the TRO Settlement Agreement;

(c)    Damages in the form of set-off;

(d)    Costs and legal fees;

(e)    Such other relief and the Tribunal should deem appropriate under the circumstances.

## V.    ISSUES TO BE DETERMINED

75.    The Terms of Reference set out the following issues to be determined, at paragraph 5.1:

(1)    Is COLT entitled to the sum of €2,227,093.57 allegedly due from Frontline under the Interconnect Agreement?

(2)    Is COLT entitled to the sum of USD 100,000 allegedly due from Frontline under the TRO Settlement Agreement?

(3)    Is COLT entitled to interest? If so, at what rate and for what period?

(4)    Is Frontline entitled to a denial of COLT's claims with prejudice?

(5)    Has COLT breached the Interconnect Agreement by reducing its capacity to accept Frontline's services by 18 circuits, by failing to pay invoices issued by Frontline, by overcharging Frontline for its services, or by providing substandard services?

(6)    Has COLT repudiated the Interconnect Agreement?

(7)    Is Frontline entitled to a declaration that COLT has breached the Interconnect Agreement?

(8)    Is Frontline entitled to damages as a result of COLT's alleged breaches and / or repudiation of the Interconnect Agreement? If so, should harm to its

business relationships with third parties be taken into account when quantifying these damages?

(9)  Was the TRO Settlement Agreement made under duress? If so, is it still a valid agreement?

(10)  Has COLT breached the TRO Settlement Agreement by diminishing the quality of the services provided to Frontline?

(11)  Is Frontline entitled to a declaration that COLT has breached the TRO Settlement Agreement?

(12)  Is Frontline entitled to damages as a result of COLT's alleged breach of the TRO Settlement Agreement?

(13)  Is Frontline entitled to any interest?

(14)  How should the costs of the arbitration be borne by the parties?


## VI.  TRIBUNAL'S FINDINGS

76.  The Tribunal makes the following findings.

77.  There was no dispute that the Interconnect Agreement and the TRO Settlement Agreement were binding as between the parties. Frontline initially argued in its Answer to the Request for Arbitration that the TRO Settlement Agreement had been entered into under duress, but that argument was later withdrawn.

78.  Under the Interconnect Agreement, COLT and Frontline agreed to connect their respective telecommunications systems and to provide services (as defined) to each other. Clause 10 provided that each party shall notify the other in writing from time to time of its "Rates" for the provision of the "Services" and the "Term" of validity of such Rates. Clause 11.1 provided that each party shall be entitled to invoice the other party for the Services on a monthly basis or, on thirty days written notice, at such other frequency as the invoicing party wishes, and that each party shall pay all Charges due (whether disputed or not) within the current month plus thirty days of the date of the invoice. Clause 11.2 provided that each party expressly reserves the right to set off any sums owing under the agreement against any sums due and owing by the other party. Clause 11.3 provided for interest to accrue on late payment of undisputed

amounts. Clause 11.4 provided that if either party disputed the Charges, it shall notify the other party in writing as soon as is reasonably practicable, identifying clearly the disputed part of an invoice and the reasons why it is challenged.

### Issues (1) - (3): COLT's Claims

79. COLT started supplying its services in February 2005, with Frontline sending telecommunications to COLT and thereby incurring charges in accordance with the Interconnect Agreement. COLT continued to provide its services through March, April and May. COLT also sent some traffic to Frontline.

80. COLT's internal billing procedures were not effective (Frontline's account had been suspended due to an administrative error) and it did not send out any invoices to Frontline for several months.[1] At the end of May 2005, it provided an oral estimate of a bill in the amount of USD 64,674.90 for the months of February and March.

81. The amount of traffic from Frontline to COLT during the first three months was not at a level to cause concern to COLT. However, from mid-May, Frontline's traffic volumes increased very substantially, from €4,000 - €8,000 per day in early May to €55,000 - €65,000 per day by early June.[2] COLT was concerned about Frontline's credit risk.[3]

82. On 1 June 2005, COLT demanded immediate payment for February - May together with an advance in respect of June, and €1.5 million in total.[4]

83. On 6 June 2005,[5] COLT issued invoices for February, March and April, totalling €296,469.96.

84. On 7 June, COLT imposed a credit limit of €75,000 and asked for a bank guarantee for €3.3 million.[6] Frontline offered to pay USD 256,350 and establish a bank guarantee for €1.5 million.[7]

---

[1] T/33/12 - T/34/14.

[2] B2/159 and statement of Per Soerensen, paragraph 15, and T/5/16 - T/9/16, and T/26/2 - T/27/19.

[3] Statement of Michael Krogh, paragraph 39.

[4] B2/124.

[5] B2/126.

[6] B2/127.

[7] B2/129.

85.    On 8 June 2005, COLT issued invoices for May, for €832,847.77.

86.    Also on 8 June, COLT indicated it would accept Frontline's settlement proposal, but proposed revised terms and stated that if the payments agreed were not confirmed the same day of transfer COLT would not guarantee uninterrupted service.[8] Frontline replied revoking its proposal.[9] COLT concluded that Frontline was trying to "stall things" and Michael Krogh recommended sending out a disconnection letter and then closing the circuits. [10]

87.    Later on 8 June 2005, COLT reduced its capacity to accept Frontline's telecommunications traffic from 20 circuits to 2 circuits. Frontline the same day applied for and was granted by the Supreme Court of the State of New York a temporary restraining order enjoining COLT from suspending, terminating, diminishing or discontinuing telecommunications services to Frontline and requiring any such services as had been stopped to be restored. COLT did restore its capacity to accept Frontline's traffic to 20 circuits.

88.    COLT and Frontline entered into the TRO Settlement Agreement dated 17 June 2005, under which the temporary restraining order would be dissolved with immediate effect, but that COLT's services to Frontline would be ramped down in accordance with an agreed schedule and would be terminated on 27 June 2005. In addition, Frontline would make part payment of outstanding invoices under an agreed payment schedule, including payments of USD 50,000 on each of 27 and 30 June 2005; and that Frontline would pay COLT's invoices for May and June traffic in accordance with the Interconnect Agreement. Except as expressly provided in the TRO Settlement Agreement, COLT's and Frontline's rights and obligations would be governed by the Interconnect Agreement.

89.    Pursuant to the TRO Settlement Agreement, COLT ramped down its services to Frontline in accordance with the agreed schedule and terminated its services to Frontline on 27 June 2005.

90.    Frontline duly paid some of the amounts due to COLT under the TRO Settlement Agreement, but it did not make the two payments of USD 50,000 due on 27 and 30 June 2005.

---

[8] B2/135.

[9] B2/138.

[10] B2/147.

91. <u>Balance of outstanding invoices</u>: COLT claimed in this arbitration the net balance of the outstanding invoices less amounts due to Frontline and less amounts paid by Frontline, as follows:

| Period | Date of Invoice | Amount |
|---|---|---|
| February 2005[11] | 6 June 2005 | €38,852.58 |
| March 2005[12] | 6 June 2005 | €11,387.41 |
| April 2005[13] | 6 June 2005 | €246,229.97 |
| May 2005[14] | 8 June 2005 | €832,847.77 |
| June 2005[15] | 6 July 2005 | €1,463,696.37 |
| | **Balance** | **€2,593,014.10** |
| Less amounts paid by Frontline | 7 June 2005 | €52,525.70 |
| | 21 June 2005 (USD 3,324.18) | |
| | 21 June 2005 (USD 35,000) | |
| | 28 June 2005 (USD 35,000) | |
| | 4 July 2005 (USD 250,000) Total: USD 323,324.18 | €274,512.58[16] |
| | **Balance** | **€2,265,975.82** |
| Less invoices from Frontline (February to April) [17] | USD 45,795.98 | €38,882.25 |
| | **NET BALANCE** | **€2,227,093.57** |

---

[11] B2/162.

[12] B2/165.

[13] B2/168.

[14] B2/177.

[15] B2/192.

[16] COLT used a conversion rate of US$ 1.00 / €0.849032.

[17] B1/34-45, and statement of Michael Krogh, paragraph 64.

92.   Each of COLT's invoice was supported by a breakdown of the calls being charged.[18]

93.   The Tribunal finds that these invoices were rightfully submitted and, after deduction of amounts paid by Frontline and amounts admittedly owed to Frontline, give rise to a *prima facie* debt owed by Frontline to COLT of €2,227,093.57.

94.   Overcharging: Frontline's only pleaded defence to the invoices (leaving aside its claim to set-off its own counterclaim) was that COLT overcharged Frontline.[19] Frontline failed to particularise its overcharging complaint and failed to submit any expert or other evidence in support of its contention, as it had said it would do. Thus, there is no basis upon which the Tribunal can conclude that COLT's charges were too high.

95.   COLT gave notice of an increase in costs on 8 and 9 June, effective 14 and 15 June 2005.[20] Clause 10.3 permitted either party to increase its rates, with a minimum seven days notice. Notwithstanding that these rate increases were "significant" (Statement of Michael Krogh, paragraph 50), there is no basis upon which the Tribunal can conclude that these increases were not justified.

96.   UCTA: In its Interim Submissions, of 25 July 2006, Frontline raised a new argument, namely that the Interconnect Agreement was subject in pertinent part to the Unfair Contract Terms Act 1977 ("UCTA"). COLT responded in its Reply Submissions, dated 11 August 2006. In all the circumstances the argument seems to the Tribunal to be academic. But for the avoidance of doubt, the Tribunal has concluded that UCTA does not apply and that in any event the terms of the Interconnect Agreement, including in particular clause 12, would satisfy the relevant standard of reasonableness. The Tribunal accepts in this regard the submissions made by COLT in its Reply Submissions at paragraphs 4.1 and 4.2.

97.   USD 100,000: COLT claimed, in the alternative, that it was entitled to the sum of USD 100,000 due from Frontline under the TRO Settlement Agreement. The TRO Settlement Agreement prescribed that two USD 50,000 payments be made to COLT on 27 and 30 June 2005 (clause 4(d) and (e)), but these were not paid by Frontline. Having concluded in favour of its principal claim (i.e. that COLT is entitled to the net outstanding invoiced amount), there is no need to decide COLT's alternative claim. In any event, the Tribunal notes that it does not consider the wording of the TRO

---

[18] B2/163-164 (February); B2/166-167 (March); B2/169-176 (April); B2/178-191 (May); B2/193-332 (June).

[19] Frontline's Answer, paragraphs 22 and 47(e) and statement of Jerome Goldman, paragraphs 1.1 and 1.2.

[20] Statement of Michael Krogh, paragraphs 47 and 49.

Settlement Agreement in prescribing certain fixed payments to be inconsistent with or undermine COLT's entitlement to its principal claim. The TRO Settlement Agreement makes clear that the prescribed payments set out in clause 4 are payments on account: clause 5 expressly states that the payments made under clause 4 may be deducted from the May invoice, but "in all other respects, the invoices for May 2005 and June 2005 shall be rendered and paid in accordance with the terms and conditions of the Interconnect Agreement ...".

98.    Interest: The Tribunal addresses the question of interest below.

### Issues (4) - (13): Frontline's Claims

99.    Frontline raised a counterclaim against COLT for damages in respect of COLT's breaches of contract.

100.    Breach: Frontline contended that by COLT's failure to invoice Frontline, its failure to honour the thirty day payment provision, its unreasonable demands for immediate payment of monies allegedly owed, and its demand for the advance of monies for costs not yet incurred, COLT breached the Interconnect Agreement (see Frontline's Answer paragraph 21).

101.    COLT expressly accepted in its submissions that notwithstanding its concerns about Frontline's credit risk, COLT was not entitled to suspend the provision of 18 out of 20 of the available circuits to Frontline during a period of 18 hours 25 minutes on 8/9 June 2005.[21] COLT accordingly accepted that subject to the express exclusions in the Interconnect Agreement and to questions of causation and remoteness, Frontline was entitled to set-off any damages it sustained as a result of the suspension of service against COLT's claim.

102.    Frontline contended that COLT's actions in suspending services under the Inter Connect Agreement caused harm to Frontline's business and business relationships. However, Frontline did not particularise its alleged harm or submit any expert or other evidence in support of the quantum of its counterclaim. While Frontline submitted examples of customer contracts in force at the time,[22] Frontline acknowledged that "[e]xpert assistance is required to provide the Tribunal with reliable quantification of the call volume lost to Frontline as a result of the service reduction that began June 8,

---

[21] Additional Submissions, dated 12 June 2006, paragraph 4.

[22] Statement of Jerome Goldman, paragraph 2.2, and exhibit at B1/385-413.

2005".[23] Thus, there is no basis upon which the Tribunal could reach a decision on damages.

103.    Frontline further claimed legal fees incurred obtaining the Temporary Restraining Order, and submitted fee notes from Hodgson Russ LLP.[24]

104.    The Tribunal during the course of the hearing questioned COLT's counsel as to whether it was his submission that Frontline's counterclaim should be dismissed or treated as withdrawn. Mr Lazarus replied: "I do not think that COLT would have any strong preference one way or the other. We would resist, however, relief being granted in the form of a declaration on a counterclaim which no one was here to support or put forward an argument to support. If the best way of achieving that would be to have the counterclaim withdrawn, then we would suggest you went that route."[25] The Tribunal concludes that in all the circumstances it should treat Frontline's counterclaim as withdrawn, without prejudice to either party.

105.    Repudiation: Similarly, the Tribunal concludes that Frontline's counterclaims in relation to repudiation should be treated as withdrawn, without prejudice to either party.

106.    Overcharging and substandard service: Frontline further contended that COLT breached the Interconnect Agreement in that it overcharged for its services and also provided substandard services to Frontline (see Frontline's Answer paragraph 22).

107.    As noted above, Frontline failed to particularise its overcharging complaint. Nor did it particularise its contention of substandard services, and failed to submit any expert or other evidence in support of its contention. The Tribunal concludes that Frontline's counterclaim concerning overcharging and substandard service should be treated as withdrawn, without prejudice to either party.

108.    Downgraded services: Frontline further contended that in direct contravention of the TRO Settlement Agreement, clause 2, COLT curtailed and downgraded the quality of its service to Frontline during the ramp-down period by diminishing the quality of the services provided resulting in calls of shorter duration.[26] Frontline failed to particularise its complaint of downgraded services in June 2005, and failed to submit

---

[23] Ibid., paragraph 2.3.

[24] Statement of Jerome Goldman, paragraph 2.8, and exhibit at B1/415-419.

[25] T/17/5-12. See also T/60/1-4.

[26] Answer, paragraph 39, and statement of Jerome Goldman, paragraph 2.5.

any expert or other evidence in support of its contention. Frontline acknowledged that "[e]xpert assistance is required to provide the Tribunal with reliable quantification of the call volume lost to Frontline as a result of the improper degradation of the quality of services between June 17 and June 27, 2005".[27] The Tribunal concludes that Frontline's counterclaim concerning downgraded services should be treated as withdrawn, without prejudice to either party.

109.   Duress: Frontline in its Answer at paragraph 38 argued that the TRO Settlement Agreement had been entered into under duress, but it later withdraw that claim in its Interim Submissions, dated 24 July 2006.

110.   Given that the Tribunal is treating the counterclaim as withdrawn, no question of interest in favour of Frontline arises.

111.   In all the circumstances, no decision is necessary and none is rendered in respect of any of the issues 4-13 inclusive identified above.


## VII.   INTEREST

112.   Each of the parties claimed interest on amounts found owing to it.

113.   The Tribunal has found that COLT is entitled to €2,227,093.57. Frontline may be entitled to set off any damages due to it under its counterclaim, but such damages cannot be quantified in these proceedings.

114.   COLT claimed interest on amounts due to it, pursuant to clause 11.3 of the Interconnect Agreement, which provided:

> "If payment of undisputed amounts is not made when due then the invoicing party may, without prejudice to its other rights, charge simple daily interest equivalent to an annual rate of 1.5% per month or the maximum permitted by law."

115.   Clause 11.3 reflects the parties' intention that interest should be paid on late payment of invoices. Invoices were required to be paid within 30 days (clause 11.1), which

---

[27] Ibid., paragraph 2.6.

meant within 30 days of 6 June, 8 June and 6 July 2005. However, COLT claims interest only as from 31 August 2005.[28]

116.  The Tribunal concludes that COLT is entitled to contractual interest on the full amount of €2,227,093.57 at the rate specified in clause 11.3, namely 1.5% per month, or 18% per annum. This equates to €1,098.29 per day. The Tribunal further concludes that 31 August 2005 is an appropriate start date, which is more than 30 days from receipt by Frontline of COLT's last invoice (i.e. 6 July 2005).

117.  The Tribunal further finds that COLT is entitled to interest from the date of this award until final payment also at the contractual rate of 18% per annum on any principal amount outstanding.

## VIII. COSTS

118.  Each of the parties claimed its costs of the arbitration.

119.  Under Article 31 of the ICC Rules, the award and the allocation of costs is a matter for the Tribunal. Under English law, and in particular section 61(2) of the Arbitration Act 1996, the Tribunal is generally to award costs in accordance with the principle that costs should "follow the event", except where it appears that the Tribunal that this is not appropriate in the circumstances.

120.  The outcome of this arbitration is an award to COLT of the full amount claimed by it, with no deduction in these proceedings in respect of Frontline's counterclaim. Accordingly, COLT is clearly the successful party and is entitled to an award of costs.

121.  The costs of the arbitration include the ICC's administrative expenses and the Tribunal's fees and expenses. These have been fixed by the ICC Court at:

| | | |
|---|---|---|
| (i) | ICC administrative expenses | USD 28,693 |
| (ii) | Fees of the arbitral tribunal | USD 192,462 |
| (iii) | Expenses of the arbitral tribunal | USD 3,845 |
| | Total | USD 225,000 |

---

[28] Interest Schedule at B1/554.

20

122.  The Tribunal concludes that these costs should be borne in full by Frontline.[29]

123.  COLT further claimed its legal costs, as follows (Schedule of Costs dated 18 December 2007):

| | | |
|---|---|---|
| (i) | DLA Piper UK | GBP 197,849 |
| (ii) | DLA Piper US | USD 28,802.50 = GBP 14,400[30] |
| (iii) | Disbursements | GBP 31,397.47 |
| | Total | GBP 243,646 |

124.  While the hourly rates appeared very reasonable (e.g. GBP 215 for a partner), the Tribunal questioned COLT concerning the time claimed (e.g. 436 hours for Mr Norman and 664 hours for Mr Smith, as well as over 47 hours for a US partner and associate, in addition to Counsel's time) given that Frontline did not submit any substantive evidence in support of its contentions of overcharging or substandard services or downgraded services in support of it counterclaim that needed refuting by COLT. DLA Piper UK and USA provided copy of their fee notes in support of COLT's costs claim. They show that at least some of the time claimed related to enforcement issues, which is not recoverable in these proceedings. In addition, substantial time may have been taken up preparing for document production, which was not ordered by the Tribunal and never eventuated. The Tribunal notes that some of COLT's costs may have been wasted as a result of Frontline's conduct of its defence (e.g. pleading duress, which was later withdrawn), but the Tribunal does not accept that Frontline acted in bad faith.

125.  The Tribunal concludes that 80% of COLT's legal costs should be recoverable from Frontline, in the amount of GBP 195,000.

## IX.  DECISION

126.  For the reasons set out above, the Arbitral Tribunal hereby makes the following Award:

---

[29]  The advance on costs of USD 225,000 was paid by COLT.

[30] At GBP 1.00 / USD 2.00.

(a)   Frontline shall pay to COLT in respect of the net balance of its unpaid invoices the amount of €2,227,093.57.

(b)   A declaration that Frontline's counterclaim relating to the loss (if any) caused to Frontline by the suspension of services under the Interconnect Agreement and the quantum of monetary damages (if any) that might be due to Frontline shall be treated as withdrawn (without prejudice to either party).

(c)   A declaration that Frontline's counterclaims relating to overcharging and substandard services and downgraded services shall be treated as withdrawn (without prejudice to either party).

(d)   Frontline shall pay to COLT interest on the principal amount of €2,227,093.57 at the 18% per annum, from 31 August 2005 up to the date of this award, and thereafter until final payment, also at the contractual rate of 18% per annum on any principal amount outstanding.

(e)   Frontline shall pay to COLT in respect of the ICC's administrative expenses and the Arbitral Tribunal's fees and expenses, which COLT paid as the advance on costs, the amount of USD 225,000.

(f)   Frontline shall pay to COLT in respect of COLT's reasonable legal fees and disbursements incurred in the arbitration the amount of GBP 195,000.

(g)   All other claims and counterclaims are dismissed.


**Place of arbitration: London, England.**

Dated: 31 May 2007.


..................................................
William Wood QC


..................................................
Gary B. Born


..................................................
**Audley Sheppard**

**(Chairman)**


22